Ned KLEZMER, an Infant Under the Age of 14, by his Mother and Natural Guardian, Yana DESYATNIK and Yana Desyatnik, Individually, Plaintiffs,

v.

Brian BUYNAK, d/b/a Camp Cayuga, Defendant.

No. CV–02–5184(JMA).

United States District Court, E.D. New York.

Jan. 21, 2005.

Daniel J. Hansen, Esq., New York City, for Plaintiffs.

William G. Scher, Esq., Garbarini & Scher, P.C., New York City, for Defendant.

### MEMORANDUM AND ORDER

AZRACK, United States Magistrate Judge.

By motion of December 16, 2004, plaintiffs in the above captioned action applied for sanctions against defendant under Rule 37(c) of the Federal Rules of Civil Procedure. Plaintiffs allege that defendant failed to preserve pre-accident maintenance and user records prepared and kept for the All Terrain Vehicle the infant plaintiff was riding at the

---

**1.** The parties have consented to me for all purposes under 28 U.S.C. § 636(c).

time of his accident. Plaintiffs' motion is hereby denied, for the reasons below.

I have determined that defendant has spoliated evidence, but I do not think that sanctions are warranted. Plaintiffs ask, as a remedy for the spoliation, that the jury be instructed to presume that the brakes on the All Terrain Vehicle were defective, and that defendant not be able to offer evidence to the contrary. Plaintiffs' proposed remedies are too severe. Rather, plaintiffs will be permitted to argue to the jury that it may draw an adverse inference from the fact that certain documents are missing.[1] Defendant will be permitted to offer evidence of the condition of the All Terrain Vehicle on the day of the accident.

### I. BACKGROUND

Infant plaintiff NED KLEZMER ("Ned") was injured August 14, 2002, while riding an All Terrain Vehicle ("quad")[2] at defendant BRIAN BUYNAK d/b/a CAMP CAYUGA (the "camp"). Plaintiff and his mother, YANA DESYATNIK, brought this suit alleging that the camp was negligent in maintaining the track and quads provided for the campers' use, that the campers were inadequately supervised, and that the quad Ned was riding ("Quad 3") was in a dangerously defective condition at the time of the accident.

The complaint was filed by plaintiffs on August 22, 2002, eight days after the accident. On October 2, 2002, plaintiffs demanded maintenance logs and records pertaining to Quad 3. *See* Exhibit 10 to Plaintiffs' Reply Memorandum in Further Support of the Spoliation Motion (Plaintiffs' Memo in Further Support). In the same discovery demand of October 2, 2002, plaintiffs also requested the disclosure of any experts retained by defendant. *Id.* On October 31, 2002, defendant provided a response to the discovery demand, and represented to plaintiffs that it had not retained an expert to testify at trial. *See* Exhibit 12 to Plaintiffs' Memo in Further Support. This response in-

---

**2.** All Terrain Vehicles are called "quads" because they have four wheels.

cluded a camp bulletin describing the quad program. *See* Exhibit 8 to Plaintiffs' Spoliation Motion. Defendant had previously, on October 15, 2002, disclosed under Rule 26(a)(1) maintenance records showing that Quad 3 had been scheduled for a tune up earlier in the year. *See* Fed.R.Civ.P. 26(a)(1); *see also* Exhibit 11 to Plaintiffs' Memo in Further Support. The records included i) a "Job Work Order" dated February 14, 2002, for work on Quad 3, with a line item for a brake adjustment; and ii) a "Statement" dated July 2, 2002, showing that the ignition on Quad 3 had been repaired. *Id.* Defendant's disclosure also included the name of one Clint Steves, identified as an individual likely to have discoverable information, and represented that Clint Steves' "address [is] unknown, [and] will be provided once obtained." Defendant's Rule 26(a)(1) Disclosure (Exhibit 2 to Plaintiffs' Spoliation Motion). The disclosure also included photographs of Quad 3 and of the accident scene. *Id.*

Defendant provided samples of the following quad records: i) a "Quad Vehicle Log", which has space to fill in serial number, color, and year of a quad (Exhibit 4 to Plaintiffs' Spoliation Motion); ii) a "Quad Maintenance Log", described as "Out of Service", but indicating, in bold uppercase letters across the top: "MAINTENANCE AND SAFETY CHECK—TO BE COMPLETED DAILY BY QUAD INSTRUCTOR", and with spaces to record various maintenance tasks, e.g., oil level, brakes, and steering (Exhibit 5 to Plaintiffs' Spoliation Motion); and iii) another "Quad Maintenance Log", with the same maintenance and safety check admonition written across the top of its predecessor form (Exhibit 6 to Plaintiffs' Spoliation Motion). The camp bulletin describing the quad program, under the heading "Safety Regulations", requires quad instructors to "report daily in the Quad Maintenance Log [ ] any/all repairs, adjustments or maintenance per Quad." *See* Exhibit 8 to Plaintiffs' Spoliation Motion. This camp bulletin reminds instructors of how seriously the camp takes safety and urges instructors to safely administer the quad program. *Id.*

On November 17, 2003 defendant produced an expert report on the condition of Quad 3 at the time of the accident. *See* Exhibits 13 and 14 to Plaintiffs' Memo in Further Support. The expert report indicates that the expert inspected Quad 3 on October 29, 2002, two days prior to defendant's representation that no expert had been retained. *Id.* at Exhibit 13. The expert concluded that the brakes on Quad 3 were fully operable. *Id.* Plaintiffs at no time requested they be able to inspect Quad 3. Plaintiffs at no time requested a deposition of defendant's expert. They apparently still have not made either request.

Ned Klezmer, the injured plaintiff, testified that he tested Quad 3 before his ride and found the quad brakes to be "not too fine." N Dep. Tr.[3] at 24, *see* Exhibit 1 to Plaintiffs' Spoliation Motion. He alerted Clint Steves, the quad instructor, of this observation, and told Steves that while the hand brake was operable, the foot brake was not. N Dep. Tr. at 24, 32. Steves told Ned that Quad 3 was usable, that it was "all right." *Id.* Steves did not personally inspect or test the quad before concluding that it was "okay", he "just looked" at it. *Id.* at 24, 26. Ned rode the quad for about 25 or 30 minutes before the accident. *Id.* at 27. He hit a bump while making a turn, and this caused the quad wheels to come off the ground and for Ned to lose control. N Dep. Tr. at 42, 44, 46. He attempted to regain control by braking, but the brakes did not respond. *Id.* at 34, 44. Ned ended up in the bushes with a broken leg. *Id.* at 47, 48.

Stephen A. Beals is defendant's summer camp director and year round caretaker. B Dep. Tr.[4] at 5–6, *see* Exhibit 1 to Defendant's Affidavit in Opposition to Plaintiffs' Spoliation Motion. According to Beals, a roster is filled out each day campers use the quads. B Dep. Tr. at 39. Campers sign in on the rosters, which are maintained on a daily basis with the instructor. *Id.* at 40. The rosters are brought "probably almost" weekly to

---

**3.** N Dep. Tr. refers to the transcript of Ned Klezmer's April 29, 2003 deposition.

**4.** B Dep. Tr. refers to the transcript of Steven A. Beals' May 29, 2003 deposition.

a central repository. *Id.* Beals looked for but could not find the roster recording which campers used Quad 3 on the day of the accident. *Id.* at 22.

Beals testified that Clint Steves was one of the counselors, or quad instructors, in charge of the quad program. B. Dep. Tr. at 10. Quad instructors are responsible for conducting safety and maintenance checks of the quads. *Id.* at 27. The camp's mechanic keeps track of larger repair jobs, such as adjusting quad brakes, which have to be performed by an outside mechanic. *Id.* at 25–26. Camp staff do not perform brake adjustments themselves. *Id.* at 47.

Beals acknowledged that the instructors are supposed to follow camp guidelines. B Dep. Tr. at 37. In discussing the camp's guidelines on quad safety and maintenance, he described the maintenance log:

. It's a folder and it is just used when checking the [ ]quads. It has different items such as, you know, tires in good condition, things like that, are there any, you know, broken parts on the [ ]quads, things like that, I believe on there they check them off as they check them each day.

*Id.* at 47. According to Beals, the quad instructor keeps these daily records in the quad shed unless there is a problem with one of the quads. *Id.* Unlike quad rider rosters, daily maintenance logs are not collected for storage at any central repository. *Id.* Beals testified it is normal course of business to maintain daily maintenance records of the quads.[5] B Dep. Tr. at 40, 54, 55. Beals could not locate the Quad 3 daily maintenance log for the day of the accident. *Id.* at 52.

Plaintiffs' and defendant's conduct during this litigation raise the following spoliation issues: i) whether maintenance logs and other records about Quad 3 existed; ii) if so, whether defendant destroyed or failed to turn those records over to plaintiffs; and iii) if defendant has destroyed or failed to turn over records, how to appropriately sanction

defendant, given the facts and circumstances of this case.

Plaintiffs argue that the records obtained in discovery and the deposition testimony establish that both a Quad 3 daily maintenance record and Quad 3 roster of users were made on the day of the accident. Plaintiffs say that the best evidence of the condition of Quad 3 on the day of the accident is the Quad 3 daily maintenance log and roster from that day. Plaintiffs suggest that the daily maintenance log would have a notation that Quad 3's brakes were loose, and the roster would have the names of any campers using Quad 3 earlier in the day. Plaintiffs contend that since no such records were turned over by defendant, the court should find spoliation, as they have been denied the evidence as a result of defendant's loss or destruction of the records. And they contend that their argument is bolstered by the fact that defendant never provided follow up information on Clint Steves, the quad instructor, and therefore plaintiff could not obtain Steves' deposition. Without Steves' deposition, plaintiffs have no i) corroboration of Ned's story that he had informed the camp of faulty brakes before taking Quad 3 out for a ride; ii) direct testimony as to a quad instructor's compliance with camp guidelines and responsibility for keeping records and for maintenance and safety of the quads; and iii) information on campers riding Quad 3 before Ned.

Plaintiffs present, as proof of defendant's culpable state of mind in failing to turn over the records, the fact that defense counsel represented, two days after his expert had inspected Quad 3, that defendant had not yet retained an expert for trial. Moreover, plaintiffs note that it took more than a year after the inspection occurred for defendant to provide plaintiff with defendant's expert disclosure and report. Given these considerations, it is requested by plaintiffs that the court instruct the jury to presume that Quad 3's brakes were defective and preclude defendant from offering any evidence to the con-

---

5. Somewhat inconsistently, Beals also testified at one point that he did not know whether the instructors generate any safety or maintenance

records after performing the checks. B Dep. Tr. at 27.

trary of the condition of the brakes on the day of the accident.

Defendant contends that it is in dispute whether a Quad 3 daily maintenance record or roster was completed for the day of the accident. A dispute as to the existence of such records would affect the determination of whether the records were withheld or destroyed. Defendant also points out that plaintiffs never tried to inspect Quad 3, and have not tried to depose defendant's expert who did. Defendant considers the spoliation argument undermined by this omission on the part of plaintiffs. Plaintiffs respond that not conducting their own inspection of Quad 3 is excused, given that they did not know if the machine had been repaired in the months following the accident. Defendant lastly complains that plaintiffs' proposed remedy is drastic considering that they had and presumably still have the opportunity to inspect the machine.

I address these arguments in a discussion of spoliation.

## II. DISCUSSION

Plaintiffs contend that defendant destroyed or lost records that would show that the camp knew that the brakes on Quad 3 were defective on the day of the accident. They seek an instruction that an adverse inference be drawn based on the destruction or non-production of the records.[6] They also seek to prevent defendant from presenting contrary evidence of Quad 3's non-defective condition on the day of the accident.

### A. Spoliation

Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *West v. Goodyear Tire and Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999). It is well settled that spoliators should not benefit from their wrongdoing. *Id.* (citations omitted). Under Rule 37(b) of the Federal Rules of Civil Procedure, a district court may impose sanctions for spoliation in violation of court-ordered discovery. Fed.R.Civ.P. 37(b). But "[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106–107 (2d Cir. 2002)

Where it is contended that records have been destroyed, a party seeking an adverse inference instruction based on the destruction must establish "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding*, 306 F.3d at 107. The same test is used where it is contended that the party in possession of the evidence withheld the evidence before trial. *Id.*

### 1. The Obligation to Preserve Evidence

The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should know that the evidence may be relevant to future litigation. *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). I find that defendant had an obligation to preserve the Quad 3 daily maintenance log and roster. This is based on my conclusion, from all of the facts and circumstances, that the records did in fact exist.

That defendant had an obligation to preserve the evidence is not really in dispute. The camp turned over samples of maintenance records, so it follows that it recognized an obligation to turn over the actual records. And an obligation to turn over the actual records necessarily includes an obligation to preserve those records. The only dispute is

---

**6.** Plaintiffs want the court to instruct the jury that because the records are missing the jury is to presume that Quad 3's brakes were defective. This is really an application for a stronger strain of a common adverse inference instruction. If plaintiffs are entitled to a presumption that the brakes were faulty, they are logically also entitled to the less severe adverse inference instruction. I will thus analyze their application as one for an adverse inference instruction.

whether the records actually existed. Defendant contends that Beals' testimony does not support a finding that the records existed; after all, Beals testified that he could not find them. But Beals also testified that it was common practice for quad instructors to maintain the daily maintenance records, and Beals even knew that they were kept in the quad shed unless a problem with one of the quads existed. Beals acknowledged that it was the responsibility of the quad instructors to check the quads each day for safety and maintenance, and to fill out a daily maintenance record. Furthermore, the camp guidelines, which Beals conceded instructors ought to follow, require this as well. Beals was able to describe a quad maintenance record and recognized it when plaintiffs' counsel showed him one at the deposition. As for the roster of campers using quads each day, Beals testified that rosters are filled out every day, and, moreover, collected each week for central storage.

It cannot be known to a certainty whether a roster was completed for the day of the accident, nor can it be known that a safety and maintenance check of Quad 3 was completed and memorialized in a daily maintenance record. I nevertheless conclude that a Quad 3 daily maintenance record and rider roster existed for August 14, 2002, the day of Ned's accident, and that defendant had an obligation to preserve them. Ned was brought to the hospital with a broken leg after falling off the quad. His lawyer filed a complaint only a week later. The camp bulletin on the quad program shows the camp is serious about quad safety, a recognition in some sense of the possibility that a quad may be involved in an accident and litigation. The camp, as noted above, turned over samples of quad maintenance forms, so it apparently concedes that if the records from the day of the accident existed, it would be under an obligation to turn them over as well. Given these facts, I conclude that defendant had an obligation to preserve the records.

### 2. The Existence of a Culpable State of Mind

■ In addition to the obligation to preserve evidence, a spoliator must have acted with a culpable state of mind. *Pastorello v. City of New York*, No. 95 Civ. 470, 2003 WL 1740606, *9–10, 2003 U.S. Dist. LEXIS 5231, *29 (S.D.N.Y. Apr. 1, 2003). The culpable state of mind factor is satisfied by showing that the evidence was destroyed knowingly or negligently, *Residential Funding*, 306 F.3d at 108 (citations and internal quotation marks omitted); i.e., a court need not find bad faith or intentional misconduct before sanctioning a spoliator. *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 268 (2d Cir.1999); *see also Pastorello*, 2003 WL 1740606, at *10, 2003 U.S. Dist. LEXIS 5231, at *29–*30. Failures to produce evidence "occur along a continuum of fault-ranging from innocence through the degrees of negligence to intentionality." *Reilly*, 181 F.3d at 268 (citations and internal quotation marks omitted).

■ Plaintiffs point to three actions of defendant they claim exhibit defendant's culpable state of mind: i) defendant's failure to provide, after its initial disclosure, further contact information for Clint Steves, the quad instructor and witness to Ned's ride on Quad 3; ii) the production of defendant's expert disclosure and report more than a year after the expert had inspected Quad 3; and iii) defendant's representation to plaintiffs that it had not retained an expert after the expert's inspection had occurred.

Defendant's actions exhibit negligence. *See Reilly*, 181 F.3d at 268. Defendant has not given a reason why its expert disclosure and report were not provided until more than a year had passed since the expert's inspection of Quad 3. Waiting a year to provide the report does not by itself point to a culpable state of mind, but defendant did not try to justify the passage of time. Worse, the expert, in all likelihood, had to have been retained before he could render any services for defendant, i.e., before he could inspect Quad 3. Defendant has not explained how it could represent to plaintiffs that it had not retained an expert when an expert had already inspected the quad. I thus conclude that defendant acted with the requisite culpable state of mind.

Plaintiffs' inability to depose Clint Steves, however, is not evidence of defendant's state

of mind. Plaintiffs' counsel told me at a discovery hearing that he had been informed that Steves was unavailable. *See* Transcript of Discovery Hearing on November 24, 2003, at 4. Plaintiffs in their reply to defendant's motion opposition papers consider "questionable" defendant's claim that it does not know Steves' whereabouts. *See* Plaintiffs' Memo in Further Support at 4. Attributing either position to defendant (that defendant told plaintiffs Steves was unavailable or that defendant does not know of Steves' whereabouts) does not support a finding that defendant acted with a culpable state of mind. Plaintiffs did not complain over the course of this litigation that they had been trying but could not locate Steves. Nor did they complain that they were being hampered in their efforts to do so by defendant. I would not ascribe fault to defendant for not knowing this witness' whereabouts. As noted, however, defendant's failure to produce the expert disclosure and report and its apparent misrepresentation that an expert had been retained together support a finding of negligence.

### 3. *The Destroyed or Lost Evidence was Relevant to Plaintiffs' Claims*

 To obtain an adverse inference charge, a party must establish that the unavailable evidence is relevant to its claims, but " 'relevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." [7] *Residential Funding*, 306 F.3d at 108.

> [T]he party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that "the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." *Kronisch*, 150 F.3d at 127; *Byrnie [v. Town of Cromwell*, 243 F.3d 93, 110 (2d Cir.2001) ]. Courts must take care not to "hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence," because doing so "would subvert

the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction." *Kronisch*, 150 F.3d at 128; *Byrnie*, 243 F.3d at 110.

*Residential Funding*, 306 F.3d at 109. If a court finds bad faith or gross negligence, the bad faith (always) and the gross negligence (usually) can support a finding that the destroyed or lost evidence was relevant to the claims of the party seeking it. *Id.* Where a court finds that the party in possession of the evidence was negligent, the party seeking the adverse inference instruction has to provide proof as above; i.e., it has to adduce evidence from which a reasonable trier of fact could infer the destroyed or lost evidence would have been of the nature alleged by the party seeking the inference. *See Residential Funding*, 306 F.3d at 109 n. 4 (cautioning that "a court's role in evaluating the 'relevance' factor in the adverse inference analysis is limited to insuring that the party seeking the inference had adduced enough evidence of the contents of the missing materials such that a reasonable jury *could* find in its favor") (emphasis in original).

 Plaintiffs argue that the missing daily maintenance log and the user roster are the best evidence of the condition of Quad 3 on the day of the accident. Assuming the maintenance log was filled out after Quad 3 was tested the morning of the accident, or even if it was filled out after Ned alerted Clint Steves of the loose brakes, and assuming the report of faulty brakes was recorded in the log, the log would be relevant to the claim that the quad's brakes were faulty and that the person at the camp responsible for quad safety and maintenance knew of the faulty brakes before Ned took the quad out. As for the user roster, there is a less compelling argument that information regarding which other campers rode Quad 3 the day of the accident (or prior to that day) would be relevant to plaintiffs' claims. All plaintiffs could reasonably get from that information is testimony from a hypothetical other infant

---

7. Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401.

camper that the camper noticed loose brakes on Quad 3. And whether that other camper would have so testified is itself speculative. I conclude, however, that, taking all the available evidence together-the records provided by defendant and the deposition testimony of both Ned and Beals-plaintiffs have established that the missing records are relevant to their claims. *See Residential Funding*, 306 F.3d at 109 ("Courts must take care not to hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence") (citations and internal quotation marks omitted). A reasonable trier of fact could conclude that the maintenance records contained a notation that the brakes on Quad 3 were loose and that the Quad 3 daily rider roster revealed the name or names of prior Quad 3 riders.

In sum, I have concluded that i) defendant had an obligation to preserve the Quad 3 daily maintenance log and rider roster from the day of the accident; ii) that defendant was negligent in its destruction or loss of the records; and iii) that the records were relevant to the plaintiffs' claims. Accordingly, I go on to discuss appropriate sanctions for defendant's conduct.

### B. *No Sanctions Are Warranted*

 Plaintiffs contend that the appropriate sanction for defendant's spoliation is that the court instruct the jury that it is to presume the brakes on Quad 3 were faulty. Plaintiffs also want to bar defendant from presenting contrary evidence about the condition of Quad 3 on the day of the accident. Defendant argues that plaintiffs' proposed sanctions are too drastic, given that plaintiffs could have obtained evidence of the condition

of Quad 3's brakes by inspecting the machine themselves. I will not impose sanctions against defendant.

 A district court has wide discretion in sanctioning a party for discovery abuses. *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir.1999). Sanctions should be designed "to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West*, 167 F.3d at 779.[8] "The sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" *Id.*, *quoting Kronisch*, 150 F.3d at 126. The court must determine the appropriate sanction based on the relative fault of the party against whom sanctions are sought and the prejudice suffered by the party seeking sanctions. *Townes v. Cove Haven*, No. 00 Civ. 5603, 2003 WL 22861921, *3-4, 2003 U.S. Dist. LEXIS 21640, *10 (S.D.N.Y. Dec. 2, 2003). Courts in the Second Circuit determine sanctions case by case. *Reilly v. Natwest Markets Group Inc.*, 181 F.3d at 267. "Trial judges should have the leeway to tailor sanctions to insure that spoliators do not benefit from their wrongdoing—a remedial purpose that is best adjusted according to the facts and evidentiary posture of each case." *Id.*

If plaintiffs' requested remedy is granted, the only evidence presented to the jury on defective quad brakes will be what plaintiffs offer, and the jury will be told to presume that the brakes were defective. Having considered the facts and circumstances of this

---

**8.** In *Kronisch*, the Second Circuit explained these rationales for the spoliation doctrine, and another, "evidentiary" rationale:

The evidentiary rationale derives from the common sense notion that a party's destruction of evidence which it has reason to believe may be used against it in litigation suggests that the evidence was harmful to the party responsible for its destruction. The prophylactic and punitive rationales are based on the equally commonsensical proposition that the drawing of an adverse inference against parties who destroy evidence will deter such de-

struction, and will properly "place the risk of an erroneous judgment on the party that wrongfully created the risk." Finally, courts have recognized a remedial rationale for the adverse inference-namely, that an adverse inference should serve the function, insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

*Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998) (citations omitted).

case, I am convinced that these or any sanctions are too severe. I will allow plaintiffs to argue to the jury that it should draw an adverse inference from the fact of the missing records. An adverse inference instruction from the court, however, is not warranted on the facts of this case. An instruction directs the jury's attention to the inference the court instructs on and can give the impression that the court thinks the jury ought to draw the inference. The suggestive force of the adverse inference instruction is precisely the reason for a court's careful analysis before ordering it.

I have considered the relative fault of defendant, and my decision reflects the conduct of both parties to the dispute. There is defendant's fault in not providing the Quad 3 maintenance log and roster from the day of the accident and for representing to plaintiffs that it had not retained an expert when it apparently had. But plaintiffs bear fault here too, for failing to ever request an inspection of the quad or a deposition of defendant's expert. *See Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir.2001) (where corporation never requested to inspect evidence prior to its destruction, district court provided no spoliation sanction); *Townes v. Cove Haven*, 2003 WL 22861921, at *3-4, 2003 U.S. Dist. LEXIS 21640, at *10-*12 (where plaintiff never inspected swimming pool in the two years after the accident and before it was altered, district court provided no spoliation sanction); *Indemnity Ins. Co. Of N, Am. v. Liebert Corp.*, No. 96 Civ. 6675, 1998 WL 363834, *6-7, 1998 U.S. Dist. LEXIS 9475, *17-*18 (S.D.N.Y. June 29, 1998) (no dismissal or adverse inference charge warranted where party never requested an inspection); *Thiele v. Oddy's Auto and Marine, Inc.*, 906 F.Supp. 158, 160 (W.D.N.Y. 1995) (no sanction where party never requested an inspection). I note that the expert disclosure and report, while admittedly provided to plaintiffs more than a year after the inspection was conducted, was provided to them more than a year ago.

Sanction rationales are not served by punishing defendant in this case. I have concluded that defendant acted negligently. *See e.g., Pastorello*, 2003 WL 1740606, at *13, 2003 U.S. Dist. LEXIS 5231, at *39-*40 (granting plaintiff limited adverse inference instruction after a finding of defendant's gross negligence). On the other hand, it is also plaintiffs' own actions or omissions that leave them without evidence that might have been helpful at trial. The risk of a wrong judgment should therefore be left to the arguments of counsel. Plaintiffs will be where they would have been if they had the missing evidence. *See, e.g., West*, 167 F.3d at 780 (reversing district court order dismissing case where the only evidence was destroyed by plaintiffs, and giving examples of lesser sanctions the Second Circuit would find appropriate); *Houlihan v. Marriott Int'l, Inc.*, No. 00 Civ. 7439, 2003 WL 22271206, *2-3, 2003 U.S. Dist. LEXIS 17382, *6-*8 (S.D.N.Y. Sept. 30, 2003) (finding no evidence of intentional destruction of evidence, noting that the plaintiff had other evidentiary options, denying adverse inference charge and preclusion of evidence by adversary, and providing only costs as a sanction). It is fairly possible that the Quad 3 maintenance log contained relevant evidence; I am not as convinced about the rider roster. Presenting both records at trial could bolster plaintiffs' claims if they were additional to expert testimony, based on an inspection of Quad 3, that the brakes were faulty. Plaintiffs never complained that Quad 3 was destroyed or lost, or that they were denied access to it. Despite what they say about the maintenance records being the best evidence of the quad's faulty brakes, I think there is no escaping the conclusion that an inspection of the quad itself in the aftermath of the accident would have provided the best evidence. I will thus permit defendant to present evidence from its expert's inspection of Quad 3.[9]

## III. CONCLUSION

For the above stated reasons, plaintiffs' motion for sanctions is DENIED. Plaintiffs

---

**9.** I make no findings in this order with respect to the expert's qualifications to testify about quad brakes.

will be permitted to argue to the jury that it may draw an adverse inference from the missing evidence. Defendant will be permitted to present evidence of the quad's condition on the day of the accident.

SO ORDERED.